**GENIE INDUSTRIES, INC., Petitioner,**

v.

**Ricky MATAK, Belinda Matak and Misty Sonnier, as Representative of the Estate of Walter Pete Logan Matak, Deceased, Respondents**

No. 13–0042

Supreme Court of Texas.

Argued September 17, 2014

Opinion delivered May 8, 2015

On Petition for Review from the Court of Appeals for the Thirteenth District of Texas

Clifford L. Harrison, Stephan Daniel Selinidis, Harrison Bettis Staff McFarland & Weems, LLP, Constance H. Pfeiffer, Beck Redden LLP, Houston TX, for Petitioner.

Edward D. Fisher, Provost Umphrey Law Firm, LLP, James Erick Payne, Jennifer Job, Provost Umprey Law Firm L.L.P., Beaumont TX, for Respondents.

Roger W. Hughes, Adams & Graham, L.L.P., Harlingen TX, Jane M. N. Webre, Scott Douglass & McConnico, L.L.P., Austin TX, for Amicus Curiae.

Chief Justice Hecht delivered the opinion of the Court, in which Justice Green, Justice Johnson, Justice Willett, Justice Guzman, and Justice Brown joined.

A product manufacturer is not liable for a design defect unless a safer alternative design exists and the defect renders the product unreasonably dangerous—that is, its risks outweigh its utility.[1] The issue is usually one of fact for the jury but may nevertheless be a legal one when the evidence is such that reasonable minds cannot differ on the risk-utility balancing considerations.[2]

In this case, the users of an aerial lift supporting a worker 40' in the air attempted to move the machine. Signs on the machine and instructions in the user manual warned of the obvious danger: the machine would tip over and the worker would fall to the ground. And that is what happened. So obvious was the danger that although over 100,000 lifts of the same general model have been sold all over the world, the jury was provided with evidence of only three similar accidents involving similar AWP lifts over the past decade— none of which involved the intentional destabilization of a fully-extended 40' lift.[3] The lift cannot be said in any sense to be unreasonably dangerous.

The jury reached a different conclusion. The respective roles of courts and juries must be carefully guarded. The right to trial by jury in civil cases is constitutionally protected because we have, as a polity, determined to lay the resolution of factual disputes at the feet of our peers. But when the facts admit of only one reasonable conclusion, it is the rule of law that must supply the decision, lest jurors be given the very power from which they are intended to protect us, deciding for whatever reasons seem good to them who should and should not prevail.

As we will explain in detail, fully mindful of the respect due the verdict of the jury, our careful review of the record in this case has revealed little evidence of a safer alternative design for the product at issue, and no evidence that the product is unreasonably dangerous. Accordingly, we reverse the judgment of the court of appeals[4] and render judgment for Petitioner Genie Industries, Inc.

## I

Genie Industries, Inc., manufactures and sells a wide variety of aerial lifts throughout the world. An aerial lift is used to raise a worker on a platform to reach the ceilings of tall buildings or other high places. One of these lifts is the Aerial Work Platform–40' SuperSeries, also known as the AWP–40S, pictured here.

1. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex.2009).

2. The most recent incident occurred when an AWP–30 lift was pushed around a stage by its base with a person on the elevated platform; the lift tipped over after the platform hit a light. Another injury occurred when an operator working alone, without using the outriggers on what was possibly an AWP lift, tried to inch the elevated lift forward by pulling on a chainlink fence; the operator broke an arm

and did not return to the work site. The third incident involved the removal of an outrigger from an extended AWP–30 lift while an operator was in the elevated basket; the lift tipped over and the operator suffered broken bones.

3. 462 S.W.3d 80 (Tex.App.–Corpus Christi 2012).

4. 462 S.W.3d 80 (Tex. App.–Corpus Christi 2012).

Figure 1: AWP 40S

The base of the AWP–40S is small, only about 29″ × 55″—narrower than a standard door—and sits on wheels. A vertical, telescoping mast is mounted on the base. An enclosed platform to hold a worker is attached to the top of the mast. A motor extends the mast, raising the platform up to 40' in the air, thus allowing a worker on the platform to reach objects as high as 45–46' above the ground. The AWP–40S is designed to be lightweight and portable. Though the lift weighs roughly 1,000 pounds, it can be rolled around, set up, and operated by a single person. The lift is well-suited for indoor work not accessible by big, heavy machinery. It can pass through ordinary doorways and can be used in tight spaces.

The base of the AWP–40S is too small to support a worker on the platform without tipping over even when the platform is not fully elevated. Before elevating the platform, the machine must be stabilized using outriggers attached to each of the four corners of the base. Each outrigger extends outward diagonally about 3' from the base. At the end of each outrigger is a leveling jack that can be adjusted up or down so that the outrigger is firmly pressed against the floor. The outriggers increase the lift's footprint and its stability, preventing it from tipping over. When the work is done and the mast lowered, the outriggers can be removed to allow the lift to pass through narrow areas. The removable outriggers contribute to the lift's compact design, which is one of its main selling points.

An electromechanical interlock on the lift prevents the platform from being elevated unless all the outriggers are in place and the leveling jacks pressed against the ground. But if the lift becomes destabilized while elevated, it continues to function. Four green lights signal the proper deployment of the outriggers. Several signs on the lift warn users not to release the lift's outriggers while it is in use. One sign, located at eye level on the machine, displays an image of a man pushing the lift while elevated and in use, and states:

DANGER: Tip-over hazard. Attempting to move the machine with the platform raised will tip the machine over and cause death or serious injury.

A warning in the lift's manual states: "Do not adjust or remove the outriggers while the platform is occupied or raised." Even without these warnings, the danger is obvious.

Genie has sold more than 100,000 of its AWP–series lifts worldwide. The few, comparable lifts that are sold on the market are virtually identical to Genie's AWP–40S. The lift's design is governed by and complies with the Occupational Safety and

Health Administration standards. The AWP–40S also complies with both the non-mandatory American National Standards Institute standards and, due to the size of Genie's world market share, the national standards in Canada, Europe, and Australia. Out of the millions of times Genie's AWP–series lifts have been used, there are apparently only three reported accidents like the one in issue.[5]

The Cathedral in the Pines Church in Beaumont has an AWP–40S that it uses to reach the ceilings of its buildings. The Church hired Gulf Coast Electric to run fiber optic cable in the ceilings and allowed Gulf Coast's employees, James Boggan and Walter Matak, to use the lift. Initially, they used the lift as instructed. They positioned the lift, deployed the outriggers, and then raised the platform with Matak standing on it. Each time they needed to reposition the lift to reach a different area, they lowered the platform and Matak stepped down. They then raised the leveling jacks, rolled the lift to another location, and redeployed the outriggers.

5. We are aware of one other reported case that involves circumstances similar to the accident in this case: *Cohalan v. Genie Indus., Inc.*, 276 F.R.D. 161 (S.D.N.Y.2011) (an auction house worker on an extended Genie personnel lift, model PLC–15P, when the lift's outriggers were not set up and the lift was being wheeled about by a colleague, fell about 20 feet when the lift tipped over) (the court held that Genie must produce incident reports involving other PLC models, including those involving the AWP series, though that series was allegedly larger, heavier, shorter, with a lower center of gravity, fixed outriggers, and an interlock system; the court noted that the impact of those differences on stability would provide data pertinent to whether the model in issue was unreasonably dangerous); *see also Cohalan v. Genie Indus., Inc.*, No. 10 CIV.2415(JMF), 2013 WL 829150, at *1 (S.D.N.Y. Mar. 1, 2013) (same case) (Genie, claiming that it had told the worker's employer that the lift was missing parts and should be retired, sued the employer for contribution and indemnity). Not one other case *nationwide* involves a similar lift and the risk alleged here. *See Adams v. Genie Indus., Inc.*, 14 N.Y.3d 535, 903 N.Y.S.2d 318, 321, 929 N.E.2d 380 (2010) (a narrow, interlock-less 1986 lift used without its detachable outriggers; plaintiff fell about 12'); *Ryle v. NES Rentals*, No. CIV.A. 3:04–CV–2800, 2006 WL 931862, at *2 (M.D.Pa. Apr. 11, 2006) (a Genie AWP–40 lift was mounted on a Genie Super–Straddle, a device allowing a lift to be used over seats but which still requires outriggers; because the attachment of this device in effect neutralized the lift's interlock, the lift elevated without outriggers and tipped over); *Transcon. Ins. Co. v. Briggs Equip. Trust*, 321 S.W.3d 685, 689, 695 (Tex.App.–Houston [14th Dist.] 2010, no pet.) (a Genie AWP–40 lift on a Super–Straddle elevated, despite the lack of outriggers, and fell); *see also Reed v. Malone's Mech., Inc.*, 765 F.3d 900, 904 (8th Cir.2014) (scissor lift operator dropped pipe that injured worker below); *N. Am. Specialty Ins. Co. v. Pen Pals Prods., LLC*, No. 5:10–CV–191 MTT, 2011 WL 2976877, at *1 (M.D.Ga. July 22, 2011) (rented Genie four-wheeled, self-propelled articulating boom lift, reaching 45' vertically and 25' horizontally, contacted powerlines); *Williams v. Genie Indus., Inc.*, No. 3:04–CV–217 CAN, 2006 WL 1408412, at *1 (N.D.Ind. May 19, 2006) (worker on the ground, unaware that mobile scissor lift's pothole protection system had engaged, caught his hand on the lift's scissor stack); *Williams v. Genie Indus.*, No. H–03–4579, 2005 WL 1606927, at *2–3, 2005 U.S. Dist. LEXIS 37429, at *5–7 (S.D.Tex. July 5, 2005) (worker driving a mobile boom lift was injured when the lift's brakes allegedly failed on an incline); *Thome v. Benchmark Main Transit Assocs., LLC*, 86 A.D.3d 938, 927 N.Y.S.2d 260, 262 (2011) (scissor lift); *Ward v. Cedar Key Assocs., L.P.*, 13 A.D.3d 1098, 787 N.Y.S.2d 792 (2004) (mobile scissor lift); *Primavera v. Benderson Family 1968 Trust*, 294 A.D.2d 923, 741 N.Y.S.2d 816, 817 (2002) (mobile scissor lift); *Young v. Genie Indus. U.S.*, No. 89665, 2008 WL 603036, at *1 (Ohio Ct.App. Mar. 6, 2008) (worker was hit by lift's boom after supervisor accidentally removed transport pin while lift was still tilted for transport); *Richardson v. Pyramid Hill Sculpture Park*, No. CA2006–06–196, 2007 WL 3243801, at *1 (Ohio Ct.App. Nov. 5, 2007) (40' Genie stick boom lift used on sloping ground; the injured worker claimed that his employer failed to provide a safety belt and adequate training and maintenance).

A church employee watching them work, John Adams, suggested the work would go faster if Matak were not lowered each time the lift was moved. With Matak still elevated, the jacks could be raised a few inches, just enough to allow the lift to roll, then re-lowered. When Boggan expressed reservations about this method, Adams reassured him that he and the other church employees did it "all the time." Actually, what they had done all the time was move the lift with the worker still on the platform, but not with the platform fully raised.

Boggan attempted to follow Adams's suggestion, but after he raised two of the leveling jacks only a few inches, the lift— with Matak still on the platform extended to its full 40' height—suddenly tipped over and crashed to the floor. Matak died of massive injuries to his head, and this action for wrongful death and survivor damages ensued.

The jury found that a design defect in the AWP–40S caused the accident. The jury was instructed as follows:

A "design defect" is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. For a design defect to exist, there must have been a safer alternative design.

"Safer alternative design" means a product design other than the one actually used that in reasonable probability—

(1) would have prevented or significantly reduced the risk of the occurrence or injury in question without substantially impairing the product's utility and

(2) was economically and technologically feasible at the time the product left the control of Genie Industries Inc. by the application of existing or reasonably achievable scientific knowledge.

The jury apportioned responsibility 55% to Genie, 20% to the Church, 20% to Gulf Coast, and 5% to Matak. The trial court rendered judgment on the verdict, and Genie appealed. The court of appeals affirmed, holding that there was legally sufficient evidence to support the jury's design defect finding.[6]

We granted Genie's petition for review.[7]

## II

■■■ "The law of products liability does not guarantee that a product will be risk free"[8] but imposes liability only for defective products that are "unreasonably dangerous to the user or consumer."[9]

To recover for a products liability claim alleging a design defect, a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery.[10]

A product is unreasonably dangerous when its risk outweighs its utility.[11] Genie argues that the plaintiffs produced no evidence that a safer alternative design for

6. 462 S.W.3d 80 (Tex.App.–Corpus Christi 2012).

7. 57 Tex. Sup.Ct. J. 306, 307 (Mar. 21, 2014).

8. *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 381 (Tex.1995).

9. *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 788–789 (Tex.1967) (adopting the Restatement (Second) of Torts § 402A (1965)).

10. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex.2009).

11. *Id.*

the AWP–40S existed or that the risk of an accident like Matak's outweighs the lift's utility. In assessing the evidence, we cannot, of course, "substitute [our] judgment for that of the [jury], so long as the evidence falls within [the] zone of reasonable disagreement." [12] But "[w]here reasonable minds cannot differ, the issue is one of law rather than one of fact." [13]

We consider first the evidence of a safer alternative design for the AWP–40S, and then turn to an analysis of the lift's risks and utility.

### III

■ "Texas law does not require a manufacturer to destroy the utility of his product in order to make it safe." [14] A safer alternative design is one that would have prevented or significantly reduced the risk of the injury, would not substantially impair the product's utility, and was economically and technologically feasible at the time. [15] This design need not be actually built and tested; a plaintiff must show only that the alternative design was "capable of being developed." [16] Importantly, however, the alternative design must not be one that would "under other circumstances, impose an equal or greater risk of harm." [17]

When evaluating the reasonableness of a design alternative, the overall safety of the product must be considered. It is not sufficient that the alternative design would have reduced or prevented the harm suffered by the plaintiff if it would also have introduced into the product other dangers of equal or greater magnitude. [18]

■ The plaintiffs' evidence of a safer alternative design for the AWP–40S came from two sources. Ken Zimmer, an expert on aerial lift design and manufacture, testified to three alternative designs, referred to as the "automatic drop-down" design, the "pothole protection" design, and the "chain and padlock" design. A fourth design—the "block" design—was suggested by Matak's attorney during direct examination of Genie's expert, Rick Curtin. We set out the evidence of each design below.

### Automatic Drop-down Design

Zimmer's automatic drop-down design idea is fairly simple and builds on technology already a part of the AWP–40S. As noted above, green lights indicate that the outriggers are properly deployed, and the lift cannot be operated unless all four of the outriggers are in place and pressing on the ground. But releasing an outrigger after the lift is in operation will not alter its function. The automatic drop-down design would change that. Releasing an outrigger would trigger an alarm and auto-

12. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005).

13. *Hernandez v. Tokai Corp.,* 2 S.W.3d 251, 261 n.26 (Tex.1999) (internal quotation marks omitted) (though factual disputes are for a jury to resolve, "whether the product is unreasonably dangerous as designed may nevertheless be a legal [question] if reasonable minds cannot differ on the risk-utility analysis considerations").

14. *Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 384 (Tex.1995) (internal quotation marks omitted).

15. Tex.Civ.Prac. & Rem.Code § 82.005(b); *Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 588 (Tex.1999).

16. *Gen. Motors Corp.,* 997 S.W.2d at 592.

17. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 337 (Tex.1998).

18. Restatement (Third) of Torts: Prod. Liab. § 2 cmt. f (1998) (cited in *Uniroyal,* 977 S.W.2d at 337).

matically begin lowering the platform at one foot per second, reducing the height from which a worker would fall if the lift still tipped over. Zimmer testified that the design would have saved Matak's life.

But nothing in the record indicates that the automatic drop-down design could have stabilized the lift or would have lowered the platform enough to prevent Matak's fall and serious injuries. Zimmer, himself, acknowledged that falls from 10 or 15 feet could be fatal, and the record, read generously, does not indicate that the platform could have reached a lower height. Absent more, Zimmer's testimony otherwise is the mere *ipse dixit* of a credentialed witness.

But an even greater problem is the added danger that this design would cause. There was evidence that a sudden, unexpected movement of the platform could startle a worker, creating an even more dangerous situation when working with live electrical wires or leaving the worker hanging onto ceiling rafters as the platform suddenly descended. Even if the design could have prevented some or all of Matak's injuries, it could just as well have increased the risks of injury to himself and others.

*Pothole Protection Design*

Zimmer's pothole protection design would simply incorporate into the AWP–40S a feature on many mobile lifts. When a mobile lift is raised beyond a certain height, small stabilization bars—also called outriggers—automatically deploy from the vehicle, not all the way to the ground, but hovering just above it to reduce the machine's ground clearance. This prevents the vehicle from violently tipping if one of its wheels enters a pothole. The lower the ground clearance, the less of a threat undetected potholes present.

But this design is not used in stationary lifts. Indeed, stationary lifts, which are much lighter than their mobile counterparts, require larger outriggers that stabilize the machine by extending farther out and engaging with the ground instead of merely minimizing ground clearance. For these machines, the threat of tipover is based on the weight distribution of the machine itself, not the possibility of being thrown off center by a pothole.

If the modified pothole technology were incorporated to Genie's lift, the existing outriggers would need to be permanently attached to the lift so that they could be mechanized. Permanent attachment and mechanization would presumably add to the lift's weight and size, thereby diminishing one of the lift's key utility factors—its versatility. Furthermore, this design would still require that the user manually lower the leveling jacks for the lift to operate safely. Nothing in either Zimmer's testimony or the record indicates how, under this design, the jacks could be automated or otherwise kept from being manipulated during use. Put simply, automating the outriggers leaves the lift vulnerable to the very misuse that occurred here. The pothole protection technology only addresses the automation of the outrigger arms, and this would not have prevented the accident in this case; here, it was the leveling jacks that were released, not the outrigger arms themselves.

Zimmer's conclusion that the design would have been safer for Matak has little support in the evidence, and there is no evidence the design would be safer in other circumstances.

*Chain and Padlock Design*

Zimmer's chain and padlock design was the simplest of all: the leveling jack handles would be chained and padlocked, and the key held by the worker on the platform, preventing the outriggers from being raised while the lift is extended. The

obvious flaw in the design is that it would do little to prevent misuse. The key could simply be left with the person on the ground, or even thrown down to him by the worker on the platform. It cannot be imagined that users intent on disregarding multiple, plain, obvious warnings of danger would be stymied by the need for a key. Indeed, it is hard to imagine why users seeking to avoid the inconvenience of lowering the platform to move the lift would accept the inconvenience of chaining and locking the jack handles every time the outriggers were set.

### Block Design

Matak's counsel himself suggested a fourth design during his examination of Genie's expert: two of the lift's four wheels would be replaced by a block so that the lift could not be moved without tilting it back on its two wheels, and off its block, to roll the machine like a loaded dolly or a two-wheeled cart. This design would not directly ensure the proper deployment of the outriggers, but the obvious necessity of tilting the machine to move it would discourage attempts to move the machine while its platform was elevated. Since releasing the outriggers would not facilitate moving the machine, there would be no incentive to attempt the kind of egregious misuse engaged in by Boggan and Adams.

While a two-wheel design would make it impossible to move a lift with the platform raised, a two-wheeled lift would also be much harder to move than a machine on four wheels. The AWP–40S weighs about 1,000 pounds and can be tipped back onto a second set of wheels, mounted on the back of the machine to move the lift through doorways and other low clearance areas. If every move required putting a machine in that mode, every move would become that much more difficult. The impact of this design would be felt in the utility of the machine.

\* \* \* \* \*

To impose liability on Genie, the plaintiffs must have presented evidence of an alternative design that (1) would have been safer for Matak and prevented or significantly reduced his risk of injury, (2) would not have been less safe in other circumstances and increased the risks to other users, (3) would not have substantially impaired the lift's utility, and (4) was economically and technologically feasible at the time. Genie argues that there was no evidence to support a design of this kind. We disagree. The evidence of a safer alternative design is weak, but we cannot say that it is less than a scintilla. Accordingly, we turn to Genie's second argument, that there is no evidence the AWP–40S is unreasonably dangerous.

### IV

Whether a defective design renders a product unreasonably dangerous depends on whether the product's risks outweigh its utility, considering:

(1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5)

the expectations of the ordinary consumer.[19]

■ This balancing is for the jury unless the evidence allows but one reasonable conclusion. In *Caterpillar, Inc. v. Shears*, for example, the issue was whether a front-end loader with a removable rollover protection structure was unreasonably dangerous.[20] Fixing the structure to the loader would have precluded serious injuries to operators and others but "would have completely precluded some of the uses for which the product was designed and to which it was put".[21] We concluded that the loader was not unreasonably dangerous as a matter of law.[22]

Commenting on *Caterpillar*, we have observed that "[e]ven if a product's utility were less severely impacted by a design change to reduce the risks associated with the product's use, the issue of whether the product is unreasonably dangerous as designed may nevertheless be a legal one if reasonable minds cannot differ on the risk-utility analysis considerations."[23] An example is *Timpte Industries, Inc. v. Gish*.[24] The product in that case was a large, open-top trailer being used to haul bulk fertilizer.[25] Atop the sides of the trailer was a

rail about 5″ wide.[26] To help load the trailer, the truck driver climbed up onto the rail, attempted to balance himself on it, and fell some 9½′ to the ground.[27] He claimed that the rail was too narrow, slippery, and subject to tripping hazards.[28] But the evidence showed that a wider rail would have increased the cost and weight of the trailer and would have presented a more inviting danger to users.[29] We held, as a matter of law, that the risk, which was fully obvious to all, did not outweigh the trailer's utility, and that the trailer was not unreasonably dangerous.[30]

On the other hand, in *Uniroyal Goodrich Tire Co. v. Martinez*, we held that there was a factual dispute for the jury to decide.[31] There, Martinez was injured when a 16″ tire he was attempting to mount on a 16.5″ rim exploded.[32] That such mismatches occur frequently and easily was well known in the industry—hence the warnings and recommended safety precautions.[33] Martinez himself knew of the danger, but testified that he mistakenly believed, because the old tire was 16″, that the rim was also 16″.[34] He might have avoided injury from an explosive mis-

19. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex.2009).

20. 911 S.W.2d 379, 380–381 (Tex.1995).

21. *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 260 (Tex.1999) (discussing *Caterpillar*).

22. *Caterpillar*, 911 S.W.2d at 384.

23. *Hernandez*, 2 S.W.3d at 260–261.

24. 286 S.W.3d 306 (Tex.2009).

25. *Id.* at 307–308.

26. *Id.* at 308.

27. *Id.* at 308–309.

28. *Id.* at 309.

29. *Id.* at 313–314, n.7.

30. *Id.* at 314–315.

31. 977 S.W.2d 328, 331 (Tex.1998) (the mere fact that a product bears an adequate warning does not conclusively establish that the product is not defective).

32. *Id.* at 331–332 (the Martinezes claimed at trial that the tire was defective because it failed to incorporate a safer alternative bead design that would have kept the tire from exploding, and that the manufacturer's failure to adopt this alternative design was negligence).

33. *Id.* at 333.

34. *Id.* at 332, 340.

match between the tire and the rim if he had available (and used) a tire-mounting machine, a safety cage or an extension hose while inflating the tire.[35] Nonetheless, because even experienced operators like Martinez could mistakenly believe they were in compliance with the warning against mounting a 16″ tire on a 16.5″ rim, there remained a latent risk that a person unaware he was mounting a 16″ tire on a mismatched 16.5″ rim would fail to appreciate the concomitantly increased danger posed by an unsecured tire.[36] The Court concluded that whether there was a safer alternative design for the tire that would have decreased the likelihood of an explosion was a question for the jury.[37] In the case at hand, a person on the ground can readily see that lifting the outriggers on a lift, while the platform bearing his colleague remains 40′ in the air, puts that colleague at serious risk of a potentially deadly fall. The ground-based lift-user cannot mistakenly believe that his actions are safe, as Martinez mistakenly believed based on the misapprehension that the tire and rim matched.[38]

 In the case before us, the evidence of the AWP–40S's utility is undisputed. The lift is designed to be small, lightweight, portable, and relatively inexpensive. To accommodate a wide variety of working environments, the lift uses outriggers with manual leveling jacks to stabilize the lift once it is positioned. This allows the lift to be used on surfaces that are not completely flat, such as the gradually sloped floor in this case, without having to

sacrifice stability. Furthermore, the lift is designed so that the outriggers are removable in order to keep the lift as narrow as possible when being moved. This allows the AWP–40S to fit through standard door frames, therein expanding the range of uses for the machine. As previously explained, the lift also incorporates a mechanical interlock to make sure that all four outriggers are installed and the leveling jacks are firmly pressed against a given workspace. Until the outriggers are properly set, the lift cannot be operated. This maximizes the utility of the lift while still ensuring that it is used safely.

The risk is that a user will ignore the instructions in the user manual, the signs on the lift itself, and the danger, obvious to even a casual observer, that the lift will tip if the outriggers are removed when a person is on a fully elevated platform. So obvious is the risk of danger from misuse of the lift that the evidence does not reflect a single other accident involving a fully extended 40′ lift. Church employees testified that they sometimes released the outriggers with the platform elevated, but only if the worker could jump down to avoid injury. The plaintiffs introduced evidence of three similar accidents,[39] but in none is there an indication that the platform was fully elevated. Genie's witness testified that there may been eight or ten other instances "of not doing it right" when using the lift, but again, none bear any indication that they, too, involved a fully elevated platform. The undisputed

---

35. *Martinez*, 977 S.W.2d at 332.

36. *Id.* at 337.

37. *Id.* at 331, 337–338.

38. *See id.* at 332, 340.

39. Once again, we are aware of but one other case—across the entire United States—in which a similar Genie lift was intentionally

destabilized while elevated and fell. *See Cohalan v. Genie Indus., Inc.*, 276 F.R.D. 161, 162 (S.D.N.Y.2011) ("At the time the lift fell over, it was being wheeled around the warehouse by a colleague of Mr. Cohalan's, and the outriggers with which the lift was equipped in order to prevent tip-over were not set up.").

evidence is that Genie has sold more than 100,000 AWP model lifts all over the world, which have been used millions of times. But the record does not reflect a single misuse as egregious as that in this case.

The five factors to be considered in determining whether a product's risk outweighs its utility,[40] with which we began this discussion, conclusively establish that the AWP–40S is not, on this record, unreasonably dangerous. The first is whether the gravity and likelihood of injury outweighs the lift's utility. While misuse of the lift can result in the most serious injury, as this case illustrates, the likelihood of its occurrence is all but nonexistent. In *Martinez,* the likelihood of injury was greater, and more importantly, even an experienced user might not appreciate the danger in a particular circumstance. Here, the danger was patent. The second factor asks whether there is a substitute that would meet the same need and not be unsafe or unreasonably expensive. There is no evidence of one. The third factor is whether there is a safer alternative design. As we have already explained at length, there is only slight evidence of such a design. The fourth factor is whether the danger of misuse is obvious and readily avoidable. The risk of tip-over is both. One need only look at the machine to appreciate this truth. And the lift's history of use in the world further confirms this fact. The last factor considers ordinary consumers' expectations. Again, the danger of misuse is obvious, even to someone not trained in handling the AWP–40S. These factors require the conclusion that the AWP–40S is not unreasonably dangerous.

We agree with the dissent that it is completely irrelevant what we would have done had we been jurors in the case, although it seems odd that the dissenting Justices would feel constrained to repeat three times that they probably would have sided with Genie. The dissent acknowledges that the AWP–40S cannot be unreasonably dangerous absent evidence that the gravity and likelihood of injury outweighs its utility, but then it concludes that a single accident is enough to show likelihood. The evidence here shows that while it is very likely that users of the lift will not read or follow the user manual or the warning signs on the machine, and likely that they will try to release the outriggers and move the lift with someone on a partially elevated platform, the chance that anyone would attempt to do so with the platform fully elevated is only one in millions. The risk of misuse in this case cannot in any sense be said to be likely.

As we said in *Caterpillar,* "[t]he law of products liability does not guarantee that a product will be risk free," only that it will not be unreasonably dangerous.[41] There is no evidence in the record before us that the AWP–40S is unreasonably dangerous.

\* \* \* \* \*

Accordingly, we reverse the judgment of the court of appeals and render judgment for Petitioner.

Justice Boyd filed a dissenting opinion, in which Justice Lehrmann and Justice Devine joined.

JUSTICE BOYD, joined by JUSTICE LEHRMANN and JUSTICE DEVINE, dissenting.

If I had been a juror at this trial, I probably would have decided that Genie

---

**40.** *Timpte Indus., Inc. v. Gish,* 286 S.W.3d 306, 311 (Tex.2009).

**41.** 911 S.W.2d 379, 381–382 (Tex.1995).

Industries' AWP 40–S aerial work platform lift is not unreasonably dangerous and thus not defectively designed. But I'm not sure, nor need I be, because no one is asking what I would have decided if I had been a juror. We are not asked in this case which alleged facts are true and which are false, nor are we asked whether the lift's risks outweigh its utility. Instead, Genie is asking the only evidentiary question it can ask this Court: whether the trial record contains any evidence— anything more than a "mere scintilla"— that would allow a reasonable juror to find that the lift's risks outweigh its utility, making the lift unreasonably dangerous and thus defectively designed. As the Court explains, this risk-utility balancing determination is a question of fact for the jury, and we cannot trump the jury's decision unless no reasonable juror hearing the evidence in this case could possibly have reached it. This record contains at least some evidence that it was both foreseeable and likely that untrained non-professionals would use the Genie lift, that they would destabilize it while the platform was raised and occupied despite the warnings and the allegedly obvious dangers, and that doing so would result in serious injuries and death, no matter how high the platform is elevated. Because this evidence, viewed in the light most favorable to the jury's verdict, would permit a reasonable juror to find that the lift's risks outweigh its utility, I respectfully dissent.

## I.

### The Standard of Review

Our well-established standard of review controls my decision in this case. The issue of "whether a product is unreasonably dangerous ... is a question of fact for the jury" to decide, "taking into consideration the utility of the product and the risk involved in its use." *Am. Tobacco Co. Inc. v. Grinnell,* 951 S.W.2d 420, 432 (Tex. 1997). The factors relevant to that balancing analysis are "for the jury to consider when determining whether a product was defectively designed." *Id.*[1] In fulfilling its duty, the jury may rely on both direct and circumstantial evidence, and often, "proof of the defect ... can only be made by circumstantial evidence." *Pittsburg Coca–Cola Bottling Works of Pittsburg v. Ponder,* 443 S.W.2d 546, 548 (Tex.1969). The jury "may believe one witness and disbelieve others" and "resolve inconsistencies in the testimony of any witness." *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986). The jury may draw reasonable inferences from the evidence, and on appeal, "[w]hether *other* possible inferences may be drawn from the evidence is not the relevant inquiry." *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 459 (Tex.1992) (emphasis added).

The jury found in this case that the Genie lift's risks outweigh its utility, and Genie contends that no legally sufficient evidence supports that finding. To prevail in this appeal, Genie must show that there is "no more than a mere scintilla" of evidence that the lift's risks outweigh its utility. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998). In deciding whether the record contains legally sufficient evidence, we must view the evidence "most favorably in support of the [jury's] finding." *Havner,* 825 S.W.2d at

---

1. *See also Boatland of Hous., Inc. v. Bailey,* 609 S.W.2d 743, 746 (Tex.1980) ("The jury may consider many factors before deciding whether a product's usefulness or desirability are outweighed by its risks."); *Turner v. Gen. Motors Corp.,* 584 S.W.2d 844, 851 (Tex.1979) (describing question and instructions to be presented to jury when "considerations of utility and risks are present in the state of the evidence, and in such cases should serve as an appropriate aid to the jury in its deliberations").

458. As an appellate court we are "not a fact finder," and we may not "substitute [our] judgment for that of the jury, even if the evidence would clearly support a different result." *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex.1998). That is not to say that the evidence in every case will always create a jury issue on the risk-utility determination. "Although whether a product is defective is generally a question of fact, in the appropriate case, it may be determined as a matter of law." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 312 (Tex.2009). In describing what the appropriate case is, we have explained that "the issue of whether the product is unreasonably dangerous as designed may nevertheless be a legal one if reasonable minds cannot differ on the risk-utility analysis considerations." *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 261 (Tex.1999).

Thus, we cannot reverse this jury's determination unless the evidence was such that "reasonable minds cannot differ on the risk-utility analysis considerations." *Id.* This Court "cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex.2005). Under this standard of review, the outcome of a risk-utility balance will "rarely" be decided as a matter of law in design defect cases "when any of these elements is disputed." AM. L. PROD. LIAB.3D § 28:19 (1997). As the Supreme Court of Georgia has observed, by adopting the risk-utility analysis as the basis for design-defect liability and entrusting juries to conduct that balancing analysis, we have necessarily "increased the burden of a defendant, in seeking a judgment as a matter of law, to show plainly and indisputably an absence of *any* evidence that a product as designed is defective." *Ogletree v. Navistar Int'l Transp. Corp.*, 271 Ga. 644, 522

S.E.2d 467, 470 (1999) (emphasis in original).

In short, we cannot "second guess" the jury. *State v. $11,014.00*, 820 S.W.2d 783, 785 (Tex.1991). This is not simply our rule; it is a principle that derives directly from our Constitution's guaranty of the right to trial by jury, and "courts must not lightly deprive our people of this right by taking an issue away from the jury." *Universe Life Inc. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex.1997). Our duty in this case, therefore, is well-established: we must determine whether the evidence that the jury heard and observed "would enable reasonable and fair-minded people to differ in their conclusions." *City of Keller*, 168 S.W.3d at 822. If "the evidence falls within this zone of reasonable disagreement," we must accept the jury's verdict. *Id.* We can only reject the jury's finding if, in light of the evidence, "reasonable minds cannot differ." *Timpte*, 286 S.W.3d at 312 (quoting *Hernandez*, 2 S.W.3d at 260–61).

## II.

### Unreasonably Dangerous

To prevail on their claim that Genie defectively designed the lift, the Mataks were required to prove that "(1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." *Timpte*, 286 S.W.3d at 311. Genie does not dispute that the evidence supports the third element (producing cause), and the Court and I agree that the Mataks offered legally sufficient evidence of the second (safer alternative design). Unlike the Court, however, I conclude that the record contains legally sufficient evidence to support the jury's finding of the first element: that the lift was unreasonably dangerous.

The evidence certainly did not conclusively establish this, and it probably would not have been enough to persuade me if I had been on the jury. But on this record, I cannot conclude that no reasonable and fair-minded juror could disagree with me. Instead, I conclude that, on this record, reasonable minds can differ.

## A. The Risk–Utility Analysis

To decide whether a product design is unreasonably dangerous, the jury must balance the product's utility against the risks involved in its use. *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 383–84 (Tex. 1995); *Turner v. Gen. Motors Corp.*, 584 S.W.2d 844, 850 (Tex.1979). We have identified five factors that may be relevant to the jury's risk-utility balancing determination:

(1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use;

(2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive;

(3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs;

(4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and

(5) the expectations of the ordinary consumer.

*Timpte*, 286 S.W.3d at 311 (citing *Grinnell*, 951 S.W.2d at 432).[2]

By design, this risk-utility analysis is a fluid process. The first factor sets forth the basic balancing test that the jury must conduct: weighing the product's usefulness (its utility) against the likelihood and seriousness of injuries that its use may cause (its risks). To oversimplify the analysis, if the product's risks outweigh its utility, it is unreasonably dangerous, and if its utility

---

**2.** This Court has never explained how, or even whether, appellate courts should utilize these factors when conducting a no-evidence review of a jury's verdict. In all of the cases in which we utilized these five factors, we were reviewing a trial court's decision on summary judgment, not a jury verdict. *See Timpte*, 286 S.W.3d at 308; *Hernandez*, 2 S.W.3d at 255; *Grinnell*, 951 S.W.2d at 425. We referred to various factors when reviewing a jury verdict in *Martinez*, but we did not utilize them in our no-evidence analysis. *Martinez*, 977 S.W.2d at 335. In other cases involving a jury verdict—including our most recent decision—we "analyze[d] the evidence in light of the charge as given," without ever referring to the factors. *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex.2014); *see also Caterpillar*, 911 S.W.2d at 384. Whether and how appellate courts should utilize the factors when reviewing a jury verdict is a relevant issue because we have held that the factors should not be included in the jury instructions, so the jury will never actually be aware of these factors when making its decision. *Turner*, 584 S.W.2d at 849 (explaining that "the analysis [of the factors] is most helpful and can be used by appellate and trial judges, and by students and commentators, but that it is not normally given to the jury"). It makes little sense for appellate courts to utilize specific factors to determine whether evidence supports a jury's verdict when the jury was not instructed to consider those factors. Since the factors, at least in theory, limit the scope of the risk-utility analysis, the better rule would be that appellate courts, when reviewing a jury verdict, should consider whether any evidence supports the jury's finding when measured against the jury instructions, whether that evidence fits within the factors or not. Since neither party raises this issue in this case, however, and since there is evidence to support the jury's verdict even when analyzed in light of the listed factors, we need not decide that issue here.

outweighs its risks, it is not. But neither the determination of a product's utility and risks nor the weighing of the two is that simple. A product's utility is not just its usefulness, but its degree of usefulness and the relative uniqueness of that usefulness as compared to other products. In this sense, the second and third factors—the availability of a substitute product and the ability to eliminate the unsafe character of the product—aid in determining the weight of the product's utility. If a product is extremely useful, but other safer products or designs are similarly or more useful, its utility may be relatively low, in spite of its extreme usefulness. By contrast, if it is only minimally or rarely useful, but no safer products or designs are as useful, then its utility might be very high.

Similarly, a product's risks are not just the dangers it creates, but the nature, likelihood, and extent of those dangers. In this sense, the fourth and fifth factors—the user's awareness and the avoidability of the dangers due to general knowledge, obviousness, warnings, and the ordinary consumer's expectations—aid in determining the weight of the product's risks. If a product is extremely dangerous, but consumers and users are aware of those dangers and consistently avoid them, its actual risks may be quite low. But a relatively safe product may present a very high risk if unsuspecting users are severely injured by the rare danger it does present. A product with very high utility, due to its great usefulness and the unavailability of substitute products or designs, is unlikely to be unreasonably dangerous unless the risks are also extremely high. A product that creates very high risks, by contrast, is likely to be unreasonably dangerous unless its utility is also extremely high.

We have made it very clear that the fluid process that this risk-utility analysis requires is not susceptible to absolutes. For example, the analysis does not absolutely require manufacturers to warn of a product's risks, especially if those risks are obvious and apparent to the ordinary user. *Caterpillar*, 911 S.W.2d at 382.[3] But it also does not absolutely absolve a manufacturer that provides an adequate warning, because "it is not at all unusual for a person to fail to follow basic warnings and instructions." *Martinez*, 977 S.W.2d at 337 (quoting *Gen. Motors Corp. v. Saenz*, 873 S.W.2d 353, 358 (Tex.1993)). Nor does it absolutely absolve a manufacturer when

---

**3.** The Court relies on *Caterpillar* to support its matter-of-law conclusion that the Genie lift's risks do not outweigh its utility. When addressing the plaintiff's defective-design claim in *Caterpillar*, however, the Court held that the claim failed as a matter of law not because there was no evidence that the product's risks outweighed its utility, but because the plaintiff "offered no evidence of a safer design . . . that could perform the same tasks" as the product at issue. *Id.* at 384. The Court resolved the defective design claim in that case based on the lack of any evidence of a safer alternative design, not based on the risk-utility determination. The Court also held as a matter of law that the manufacturers "did not have the duty to warn" because the dangers were obvious to the product's ordinary user. *Id.* at 383. The Court relied on *Joseph E. Seagram & Sons, Inc. v.* *McGuire*, 814 S.W.2d 385 (Tex.1991), in which the Court held as a matter of law that the defendant owed no duty to warn of "the danger of developing the disease of alcoholism from prolonged and excessive consumption of alcoholic beverages." *Id.* at 385. We have recognized that "the duty to warn of defects is distinct from the duty to design safe products," and that the obviousness of a risk is not determinative of the latter duty in Texas. *Timpte*, 286 S.W.3d at 313. Moreover, "[i]t is firmly established in Texas that the existence and elements of a common law duty are ordinarily legal issues for the court to decide." *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 181 (Tex.2004). In short, the Court's matter-of-law conclusions in *Caterpillar* did not involve the risk-utility analysis at all.

"the defect is apparent." *Id.* at 336; *Timpte,* 286 S.W.3d at 312 ("liability for a design defect may attach even if the defect is apparent"); *Turner,* 584 S.W.2d at 850 (same).

It used to be the law in Texas that the plaintiff's awareness and appreciation of the risk, whether due to warnings or to the obviousness of the risk, was an absolute defense against a defective-design claim. *See Rourke v. Garza,* 530 S.W.2d 794, 800 (Tex.1975) ("It is an appropriate defense that the user voluntarily exposed himself to the risk posed by the defective product with knowledge and appreciation of the danger."), *abrogated on other grounds by Ford Motor Co. v. Ledesma,* 242 S.W.3d 32 (Tex.2007). But we have since rejected such absolutes, holding that an "open and obvious" and "generally known" danger can give rise to liability, *see Timpte,* 286 S.W.3d at 313, and an otherwise adequate warning is not a bar to liability, *id.* at 313–14. Under the risk-utility analysis, "warnings and safer alternative designs are factors, among others, for the jury to consider in determining whether the product as designed is reasonably safe." *Martinez,* 977 S.W.2d at 337. A product may thus be unreasonably dangerous as designed even if the defect is apparent or the manufacturer has adequately warned of the dangers, because the anticipated awareness and avoidability of the dangers and the ordinary consumer's expectations are not absolutes. Instead, they "are but two factors for the jury to consider when determining whether a product was defectively designed." *Grinnell,* 951 S.W.2d at 432; *see also Hernandez,* 2 S.W.3d at 257; *Martinez,* 977 S.W.2d at 335–37.

We have rejected such absolute rules in favor of the more fluid risk-utility analysis because that analysis provides a more effective way to "encourage manufacturers to reach an optimum level of safety in designing their products." *Timpte,* 286 S.W.3d at 314. A design that eliminates a risk is safer than a design that retains the risk, even if the risk is open and obvious or warned against. *Id.* As "we have long recognized[,] ... the duty to warn of defects is distinct from the duty to design safe products," even "in the context of an obvious risk." *Id.* at 313. "Thus, if it is reasonable for a product's designer to incorporate a design that eliminates an open and obvious risk, the product reaches a more optimum level of safety by incorporating the safer design than by keeping the current design with the open and obvious risk." *Id.*

In this case, the Court concludes, as a matter of law, that the Genie lift was not unreasonably dangerous because its risks were both obvious and warned against. While those facts are certainly important to the risk-utility analysis, the Court's own precedent rejects the idea that they make the lift safe *as a matter of law.* "The fact that a product user is or should be aware of the existence and avoidability of dangers inherent in a product's use that are obvious, commonly known, or warned against, ... may ... be decisive in a particular case." *Hernandez,* 2 S.W.3d at 258. But such a determination cannot be based merely on the existence of a warning or obviousness of the dangers, as if either were "an absolute bar—like certain affirmative defenses—to liability for a defective design." *Id.* We must therefore review the record in this case to determine whether it contains any evidence that would allow a reasonable juror to conclude that the risks of the Genie lift outweigh its utility, in spite of the warnings and the allegedly obvious nature of its risks.

**B. The Utility of the Lift**

The evidence regarding the lift's utility is essentially undisputed in this case. As

the Court explains, the evidence established that the lift, while able to reach heights exceeding forty feet, is relatively lightweight, portable, compact enough to fit through ordinary doorways, capable of being moved and operated by a single person working alone, and relatively inexpensive. Genie's corporate representative and director of product safety, Rick Curtin, emphasized that the lift's portability was "very important," and was "the key thing that makes the machine useful." The Mataks essentially offered no evidence to contradict this. Instead, they sought to prove that, as useful as Genie's lift may be, the fact that safer alternative designs exist reduces the weight of its utility, and that the risk of serious injury from misuse was also substantial. The Court acknowledges this evidence, but concludes that the "factors ... conclusively establish that the [Genie lift] is not ... unreasonably dangerous." *Ante* at 12. I agree that the evidence conclusively establishes that the lift's utility is substantial. But the jury concluded that its risks outweighed its utility, however great its utility may be. Thus, we must decide whether there is more than a "mere scintilla" of evidence that the lift's risks outweighed its undisputed utility.

### C. Identifying the *Relevant* Risk

To conduct the risk-utility analysis, we must first identify the product's relevant risk. The first factor identifies the risk as "the gravity and likelihood of injury from [the product's] use." The evidence in this case conclusively established that the toppling of a lift could cause extremely grave injuries: this lift's fall from forty feet resulted in Logan Matak's death, and everyone agrees that a fall from even lower

heights can also cause serious injury or death. Moreover, Genie admitted that it is foreseeable that the lift will tip over if the leveling jacks attached to the outriggers are raised while the lift is extended and occupied. Genie warned against this very danger: "**Attempting to move the machine with the platform raised will tip the machine over and *cause death or serious injury*.**" According to the Mataks, the evidence supports the jury's finding that the lift was unreasonably dangerous because, despite the foreseeability of such accidents and the likelihood of such serious injuries, Genie "did nothing to eliminate this risk" and instead just put a warning on it.

In response, Genie contends that these risks arise only if the lift is misused, in a way that is contrary to the instructions and disregards both the warning and the "open and obvious dangers." Genie relies on our decision in *Timpte*, in which we found no evidence that a dual-hopper grain trailer was unreasonably dangerous and noted that "any risk from [the defendant's product] itself stems only from the risk that a user will ignore both [the defendant's] warnings and open and obvious dangers." *Timpte*, 286 S.W.3d at 314. According to Genie, our "analysis [in *Timpte*] about how to weigh facts involving a *high utility* product where the associated risk is *obvious* and described in *clear warnings* and where the risk arises only in the unlikely event of *intentional misuse* should be dispositive here." Because the lift's utility is undeniably high and the only risks are obvious risks that result only from misuse, Genie contends, we should hold that the product is not unreasonably dangerous as a matter of law, just as we did in *Timpte*.[4]

---

4. Two amicus curiae, the Texas Association of Defense Counsel and the Association of Equipment Manufacturers, have filed briefs supporting Genie's argument on this point. The TADC asserts that, contrary to our decision in *Timpte*, the court of appeals here gave

We did not hold in *Timpte*, however, that risks that arise only from the misuse of a product are irrelevant to the risk-utility analysis, or that a product cannot be unreasonably dangerous if its only risks result from misuse. To the contrary, we explained in *Hernandez* that "the fact that the foreseeable risk of harm is due to a misuse of the product, rather than an intended use, is not an absolute bar to liability for that portion of an injury caused by a product's defective design." *Hernandez*, 2 S.W.3d at 257. "Instead," we explained, "misuse of a product is a factor that must be considered in allocating responsibility for the injury." *Id.* When misuse is a factor in the risk-utility analysis, and the product's only dangers result from its misuse, the nature of the *relevant* risk necessarily changes. We made this point clear in *Hernandez*, in which the plaintiff alleged that a cigarette lighter was defectively designed and unreasonably dangerous because it lacked a child-resistant safety mechanism. *Id.* at 255. We explained in that case that the relevant risk "is not that a child who plays with a lighter may harm himself. We assume that that risk is substantial.... Rather, the risk is that a lighter will come into a child's hands." *Id.* at 260. "The relevant risk," we explained, "includes consideration of both the likelihood that adults will allow children access to lighters and the gravity of the resulting harm." *Id.*

In the same way, the question here is not whether it was foreseeable and likely that raising the leveling jacks while the lift is elevated and occupied would cause the lift to tip over and seriously harm its occupant. No one disputes here that it was. The question here is whether this misuse was foreseeable and likely in spite of both the allegedly obvious dangers and the existence of the warning. As Genie argues, the Mataks "conflate the risks arising from a misuse with the risk that a product will be misused in the first place." I agree with Genie that the relevant risk in this case is "the likelihood that the product will be misused" in a way that results in injury. Thus, the relevant risk here was the risk that operators would raise the leveling jacks and attempt to move the lift when the platform is elevated and occupied, despite the warning and the allegedly obvious and open dangers.

## D. The Evidence of the Relevant Risk

Genie contends, and the Court agrees, that there is no evidence in this record that the risk of this kind of misuse was foreseeable and likely despite the warning and obvious dangers. Genie acknowledges that the record contains three reports regarding similar accidents that occurred when those operators, like the operators in this case, raised the leveling jacks while the platform was elevated and occupied.[5] The jury heard testimony and received accident reports about those similar accidents. But Genie contends that all of those accidents involved less serious injuries because the platform was much lower when the lifts tipped over. And more importantly, Genie asserts that the evidence of those three accidents did not

---

"controlling weight to risks caused by intentional misuse and disregarding obvious risks," when "the risk of harm arises only when users disregard adequate warnings and obvious dangers." Similarly, the AEM contends that, contrary to *Timpte*, the court of appeals "gave no weight at all to the intentional misuse, the significant warnings includ-

ed on the Genie platform, and the obviousness of the risk."

5. Genie's director of product safety also acknowledged that he had reports of "eight or nine or ten instances of people not doing it right." Whether there was evidence of thirteen instances of similar misuse or only three, however, is not significant to my conclusion.

indicate a "likelihood" of such accidents because the evidence also established that Genie has sold "hundreds of thousands" of these lifts worldwide, and they have been used without incident "literally 'millions' of times." Genie contends that the evidence thus conclusively establishes that the relevant risk is "very slight."

The Court agrees with Genie, emphasizing that the evidence in this record of similar accidents and misuses did not indicate that the platform was "fully elevated" when the users tried to move the lift in those cases, and concluding that the evidence thus establishes only that "the chance that anyone would attempt to [move the lift] with the platform fully elevated is only one in millions." *Ante* at 12. This conclusion ignores both our precedent regarding the role of evidence of similar accidents and, more importantly, the evidence of how and why the accident at issue here actually occurred.

With regard to the role of evidence of similar accidents, we acknowledged in *Hernandez* that it is difficult to apply the risk-utility analysis when the evidence suggests that it is unlikely that a product will cause any accidental harm, but when it does the harm will likely be severe. 2 S.W.3d at 261. In that case, we agreed that the evidence established that although "children will almost certainly obtain access to lighters, . . . this will not happen often in comparison with the number of lighters sold, but . . . when it does happen the harm caused can be extreme." *Id.* at 260. In light of this, the manufacturer urged us not to apply the risk-utility analysis and instead determine the product's dangerousness based solely on whether the product was more dangerous that ordinary consumers would expect it to be. *Id.* at 261. The manufacturer noted that the Legislature has adopted just that approach for cases involving firearms and ammunition,[6] and urged us to judicially adopt the same approach for cigarette lighters, as courts in other jurisdictions had done. *Id.* at 261–62. We refused to do so, explaining that "we are reluctant to carve out exceptions to the risk-utility test that we have employed for years and that has been adopted by the Restatement, especially when consumer expectation is a factor to be considered in applying the risk-utility test and may in some cases outweigh all other considerations." *Id.* at 262 (emphasis omitted).

Importantly, the "difficulties" that led the Legislature to reject the risk-utility analysis in favor of the consumer-expectations test for firearms, like the "difficulties" that the manufacturer asserted in *Hernandez*, arose from the fact that, with both guns and cigarette lighters, it is highly unlikely that the product will cause any accidental harm, but when it does the

6. For public policy reasons, the Legislature has declared that the risk-utility analysis does not apply to a defective design claim against a manufacturer or seller of firearms or ammunition. *See* TEX. CIV. PRAC. & REM. CODE § 82.006(b) ("The claimant may not prove the existence of the defective design by a comparison or weighing of the benefits of the firearm or ammunition against the risk of personal injury, property damage, or death posed by its potential to cause such injury, damage, or death when discharged."). Instead, a claimant may prove that a firearm was defectively designed only by proving that the gun, as designed, did not function as an ordinary consumer of firearms would have reasonably expected. *Id.* § 82.006(a)(1) (claimant must prove that "the actual design of the firearm or ammunition was defective, causing the firearm or ammunition not to function in a manner reasonably expected by an ordinary consumer of firearms or ammunition"). We thus noted in *Hernandez* that "[d]ifficulties in applying the risk-utility test have prompted the Legislature to prescribe a consumer-expectation test for firearms and ammunition." 2 S.W.3d at 261.

harm is likely to be severe. *Id.* at 261 (explaining the manufacturer's argument that "the risk-utility analysis is ill-suited for cases like this when the utility of a product design is largely satisfaction of consumer preference and the risk of harm, while improbable relative to the number of products sold, is often calamitous"). Although we "recognize[d] that such circumstances make the use of the risk-utility test difficult," *id.* we refused to reject the risk-utility analysis and concluded instead that "[e]ach of these considerations is relevant in assessing the risk," *id.* at 260.

We reached the same conclusion in *Martinez*, in which we acknowledged that "there ha[d] been few reported [similar] accidents involving tires with this particular warning label." *Martinez*, 977 S.W.2d at 337. We held that the relatively small number of similar accidents was "relevant, and perhaps would persuade many juries," but we stated that "we cannot say that it conclusively establishes that the tire is reasonably safe when weighed against the other evidence." *Id.* Under *Hernandez* and *Martinez*, the Court's matter-of-law conclusion here that the lift is not unreasonably dangerous because the jury heard evidence of only a few similar accidents is simply wrong. Although the number of similar accidents that the jury heard about was small compared to the "millions" of uneventful uses of the lift worldwide, we have held that such evidence does not conclusively establish that the relevant risk is "very slight."

In addition, the Court's reliance on the relatively small number of similar accidents ignores the evidence that the jury heard about how and why this accident occurred. Here, as in *Martinez* and *Her-*

*nandez*, the record contains other evidence [7] of the circumstances surrounding the accident, which would permit a reasonable juror to conclude that the relevant risk was high even if the number of actual accidents was relatively low.

John Adams, the church's employee in charge of audio and HVAC, testified that he and the church's other maintenance staff used the lift "just about every week," and he asked someone to raise the jacks and move the lift with him in it "[e]very time" he used it. The church's IT director, Clifton Ray Poe, testified that he also used the lift, and he agreed that it was "fairly common to just loosen the feet and slide it over a little bit" with someone in it.

Adams claimed that he had read the entire user's manual, and admitted that he had seen the warning on the lift, that his supervisor at his prior job had told him not to move the lift "if any of the outriggers are raised," and that this warning was "fairly common sense." Despite these instructions, warnings, and "common sense" knowledge, however, Adams admitted that he raised the leveling jacks and moved the lift "every time" he used it. But in his case, he explained, the lift was usually extended only about 10 or 12 feet up, at a level where he "felt comfortable jumping" if necessary.

In this case, according to Adams, he moved the lift with Logan Matak in it at least twice before the accident occurred. The first time, Matak "came all the way down" before Adams moved the lift, and the second time he came down to "10 or 12 feet." Adams raised the leveling jacks only "[m]aybe an inch to two," safely moved the lift, and re-set the jacks, and Matak then raised the lift back up to 35–40

---

7. The Court is simply incorrect when it says I conclude "a single accident is enough to show likelihood." *Ante* at 12. To the contrary, I conclude that the evidence I detail here is enough to show likelihood, or at least enough for a reasonable juror to find a likelihood sufficient to conclude that the risk outweighs the utility.

feet. About thirty minutes later, Matak asked Adams and Jimmy Boggan, Matak's supervisor, to move him again.

According to Adams, he then walked over to the lift and saw that Boggan was already raising a leveling jack, so he began to do the same. He claimed he "didn't look to see if [the lift] was raised," did not know whether Matak was still "30 feet up or 12 feet up," and just "assumed [that Matak] was happy" being moved where he was. He explained that he did not even think about how high Matak was at the time because he was in a hurry and was just helping Matak while trying to do his own job: "When you're focused on getting your other job done and the other things you got coming behind that and you're trying to move at a rapid pace and the man said that he was ready to move, I never thought to look up and look for him."

Adams speculated that, if he had looked up and noticed how high Matak was, it would have caused him concern about trying to move the lift, and he would have asked if Matak was "sure" he wanted to be moved. Unfortunately, Adams did not look up. Instead, he looked down and saw that Boggan was already raising the leveling jacks on one side of the lift, so he knelt down and raised the other two jacks just off the floor, "[m]aybe half to an inch." As soon as he began to straighten back up, he heard Matak say "I'm leaning," and only then did he realize then that the lift was too high. He grabbed the lift to keep it from falling, but by then there was nothing he could do and "it kept coming," so he backed out of the way as Matak fell to his death.

Boggan also testified and confirmed that Adams said that they "push [a church employee] around in that [lift] all the time." Like Adams, Boggan claimed that, just before the fall, he raised the leveling jacks

only enough to take "the pressure off it," enough to clear the carpet. Boggan testified that Adams was the one who suggested moving the lift with Matak in it, to save time, and that he and Matak agreed to "try it," but did so "on the total assumption that what [Adams] says is true, that the church uses that thing and moves it around all the time." Consistent with the testimony of Adams, Poe, and Boggan, the Matak's expert, Ken Zimmer, testified that "in the industry . . . it was widespread that people used these [lifts] without outriggers" in place.

Adams also testified that, although he purchased the lift involved in this accident and used it regularly, he received no formal training on its operation. Instead, his only "training" was when the maintenance staff at the church where he had previously worked showed him how the lift operates. Brent Sparks, the church's worship minister who had also used the lift, admitted that he did so even though he had never read the manual and was not familiar with its warning (and even though he considers himself to be "a careful person"). Boggan, who had worked as an electrician for Gulf Coast for eleven years, testified that he had never received any formal training on how to use "one of these lifts," had never read the manual for "this lift or any other lift like this," and did not read any of the warnings. Consistent with these admissions, Zimmer, the Matak's expert, explained that dealers regularly rent these lifts to non-professionals. In his opinion, "[m]anufacturers know that these machines are gonna be abused, misused, [the users] aren't gonna be trained properly. . . . [T]hey don't read the manual. . . . [They] rent the machine . . . and take it home and use it." Indeed, the portable, lightweight, inexpensive qualities that increase the lift's utility could make it more

likely that untrained users will operate it.[8]

This testimony, combined with the evidence of at least three similar accidents involving the same lift design, would permit a reasonable juror to conclude, or at least draw the reasonable inference, that:

- Adams did not intentionally destabilize the lift knowing that it was "fully elevated," but instead assumed that the platform was at a lower and less dangerous level;

- Despite the warning and apparently obvious dangers, Adams believed it was safe to destabilize and move the lift, at least with the platform at a lower level, because he and others regularly did so without incident;

- Despite the warning and apparently obvious dangers, this is a common assumption, particularly in light of how often untrained non-professionals use the lift, and as a result, the use and movement of the lift when it is destabilized is a regular or common occurrence;

- Workers like Boggan and Matak, who do not use the lift very often, will follow the lead of workers like Adams, who do, and will try to move the lift when it is occupied despite the warning and apparently obvious dangers;

- The lift is not safe when it is moved or destabilized, even when the platform is at a lower level, because a

fall when the platform is at any level can cause serious injuries and death;

- The fact that the lift can be, and commonly is, destabilized and moved at a lower level without incident makes the lift even more dangerous because it gives users a false sense that it is safe to move the lift with the platform at a lower level, which can lead to the kinds of assumptions and accidents that occurred here;

- Despite the warning and apparently obvious dangers, it is foreseeable and likely that operators are going to destabilize and move the lift when the platform is extended and occupied; and

- It is therefore likely that some users of this product will sustain serious injuries and deaths due to the misuse of the lift, despite the warning and apparent obvious dangers.

Based on this evidence, I conclude that reasonable jurors could have different views regarding "the user's anticipated awareness of the dangers inherent in the product," the "avoidability" of those dangers "because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions," the "expectations of the ordinary consumer," and thus the "gravity and likelihood of injury" from the product's use. *Timpte*, 286 S.W.3d at 311 (quoting *Grinnell*, 951 S.W.2d at 432). I would

---

8. Addressing the risks of cigarette lighters in *Hernandez,* we explained that "[t]he risk that adults, for whose use the products were intended, will allow children access to them, resulting in harm, must be balanced against the products' utility to their intended users." 2 S.W.3d at 259. "Whether adult users of lighters should be deprived of this choice of product design because of the risk that some children will obtain lighters that are not child-resistant and cause harm is the proper focus of the common-law risk-utility test."

*Id.* at 260. In the same way, the risk that Genie's dealers and trained professionals will allow untrained non-professionals like Adams, Boggan, and Matak to operate the lift, resulting in harm, is a factor to be balanced against the lift's utility to its intended users under the risk-utility test. Based on the testimony of the witnesses in this case, a reasonable juror could conclude that the risks of unintended uses and users outweighed the utility of the lift for intended uses and users.

thus hold that the record contains at least some evidence on which a reasonable juror could conclude that the relevant risk of the Genie lift outweighs its utility.

### E. *Timpte* and *Martinez*

The Court relies heavily on *Timpte*, in which we held that a product's risks did not outweigh its utility as a matter of law. The plaintiff in *Timpte*, Gish, was injured when a gust of wind blew him off of the top of a dual-hopper trailer, onto which he had climbed to grab a malfunctioning silo downspout. 286 S.W.3d at 308. Gish alleged that the trailer was defectively designed because (1) the rail around the trailer's open top, on which he was trying to stand when he fell, was only five inches wide, and (2) the ladder that he had climbed, which was intended for access to an observation deck that sits below the rail, should not have had the top two rungs that he used to access the top of the trailer. *Id.* at 308–09. *Timpte* did not involve a jury trial; we held that the manufacturer was entitled to summary judgment.

As is the case here, we concluded in *Timpte* that the evidence established that the utility of the trailer's top rail design was "undeniably very high." *Id.* at 313. Also as here, the risk of falling was "obvious," the product warned users not to engage in the conduct that the plaintiff was engaged in at the time of his injury, and the relevant risk "stem[med] only from the risk that a user w[ould] ignore both [the] warnings and open and obvious dangers." *Id.* at 312–14. But what is present in this case that was not present in *Timpte* is evidence that ordinary users would commonly misuse the product despite the warning and apparently obvious dangers. We mentioned in *Timpte* that Gish had climbed up on the trailer "on several other occasions when the downspout would not

lower," but we made no reference to any evidence that anyone other than Gish had ever done so. *Id.* at 308. While the evidence in *Timpte* thus could establish only that the risk was "extremely low" and "very slight," *id.* at 313–14, the evidence of other users' common misuse of the Genie lift could establish that the risk was relatively high, given the availability of a safer alternative design, or at least permit a reasonable juror to conclude it was.

This case, therefore, is more analogous to *Martinez*, in which the plaintiff was seriously injured when he attempted to install a 16-inch tire on a 16.5-inch rim. 977 S.W.2d at 332. He did this in spite of the fact that the tire bore a "prominent warning label containing yellow and red highlights and a pictograph of a worker being thrown into the air by an exploding tire." *Id.* As here, the product's label prohibited the specific conduct the plaintiff was engaged in at the time of his injury and warned that such conduct could result in serious injury or death:

> **DANGER**
> NEVER MOUNT A 16″ SIZE DIAMETER TIRE ON A 16.5″ RIM. Mounting a 16″ tire on a 16.5″ rim can cause severe injury or death. . . .
>
> . . .
>
> NEVER inflate a tire which is lying on the floor or other flat surface. . . .
>
> NEVER inflate to seat beads without using an extension hose with gauge and clip-on chuck. . . .
>
> NEVER stand, lean or reach over the assembly during inflation. . . .
>
> Failure to comply with these safety precautions can cause the bead to break and the assembly to burst with sufficient force to cause serious injury or death.

*Id.* "Unfortunately, Martinez ignored every one of these warnings." *Id.*

The issue was the same in *Martinez* as it is here: "whether a manufacturer who knew of a safer alternative product design is liable in strict products liability for injuries caused by the use of its product that the user could have avoided by following the product's warnings." *Id.* at 331. We concluded that the answer was yes, observing that the defendant acknowledged at trial "that warnings are an imperfect means to remedy a product defect," just as Curtin did in this case. *Id.* at 336. We agreed with the Restatement that warnings and safer alternative designs are merely "factors, among others, for the jury to consider in determining whether the product as designed is reasonably safe." *Id.* at 337. We specifically noted that "[t]he jury heard firsthand how an accident can occur despite the warning label, and how a redesigned tire would have prevented that accident." *Id.* "Unless the subject matter is solely for experts," we concluded, "jurors are capable of forming their own opinions from the record as a whole." *Id.* at 339.

Just as in *Martinez,* the jurors in this case were capable of forming their own opinions based on the evidence. They did so, and they did not all agree. Ten members of the jury found that the risks of Genie's lift outweigh its utility, making it unreasonably dangerous and thus defectively designed. But they did so thoughtfully, assigning only 55 percent of the responsibility for Matak's death to Genie, while assigning 20 percent to the church, 20 percent to Matak's employer, and 5 percent to Matak himself. Because some evidence supports the jury's findings, we are bound by the law to respect its decision.

### III.

#### Conclusion

Having carefully reviewed the testimony, photographs, videos, other exhibits, and the trial court's instructions and questions to the jury, I probably would have concluded that Genie's lift was not unreasonably dangerous and thus not defectively designed, if I had been a juror at this trial. But I cannot say that my view is the only reasonable one. After five days of trial, ten members of this jury found that Genie's lift was defectively designed. Because there is some evidence in the record to support that verdict, this Court must affirm, even if each of us would have reached a different verdict. Thanking all twelve jurors for their service in this case, I respectfully dissent.